SO ORDERED: April 19, 2013.



**Robyn L. Moberly**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ANTHONY PORTER | ) | CASE NO. 12-10179-RLM-13 |
| | ) | |
| Debtor | ) | |

**ORDER DENYING DEBTOR'S MOTION**
**TO AVOID "LIEN"OF J.G. WENTWORTH**

This matter comes before the Court upon the Debtor's Motion to Avoid the

Judicial Lien (the "Motion") of J.G. Wentworth, S.S.C. Limited ("Wentworth") and

Wentworth's objection (the "Objection") to that motion.  Hearing on the Motion and the

Objection was held on April 8, 2013 and at the conclusion of that hearing, the Court

took ruling on the matter under advisement.  For the reasons stated below, the Court

now DENIES the Motion.

*Background*

Anthony Porter ("Porter") was involved in an automobile accident on June 13,

1

1995.  He sued Robin Miller ("Miller"), the driver of the other vehicle involved, and the parties settled out of court.  The settlement agreement executed on June 4, 1997 (the "Settlement Agreement") provided that Porter would receive $175,000, of which all *but* $54,921.00 was paid out to Porter and his attorney for various legal, medical and other expenses.  The $54,921.00 that was withheld from immediate distribution was placed in a structured settlement held for Porter's benefit and was to be paid to Porter in quarterly installments of $1090, beginning on September 7, 2001 (the "Quarterly Payments").  The Quarterly Payments were guaranteed for twenty years, and continued thereafter until Porter's death.

To fund the Quarterly Payments, Miller's insurer contracted with Erie Indemnity Company (the "Annuity Company") to set up an annuity from which the Quarterly Payments were to be paid (the "Annuity Contract").  Under "General Provisions", paragraph C, the Annuity Contract provided that "[n]o sum payable under this Contract with respect to any Payee may be assigned, commuted or encumbered by the Payee, and, to the extent permitted by law, no such sum shall in any way be subject to any legal process against such Payee".

About two and a half months after the Settlement Agreement was executed, and at least four years *before* payment to Porter of the Quarterly Payments was to commence, Porter executed a purchase agreement (the "Purchase Agreement") wherein he sold his interest in the Quarterly Payments to Wentworth for $5,245.59.  The Purchase Agreement was replete with references that the transaction between Porter and Wentworth was a sale and that Porter was assigning his rights in the Quarterly Payments to Wentworth.  The Purchase Agreement provided that Porter was

2

making certain representations and warranties, among them, being that, "[y]ou agree that the transaction set forth in the Agreement is not a loan or other financing transaction" and that "[t]his Agreement is a valid sale, transfer and assignment...". Another representation and warranty made by Porter was that "[t]he signing by You of this Agreement and the other documents will not violate the Release, the Annuity, or any other agreements you have signed".   Under the section entitled "Instructions to Annuity Company: Acknowledgment of Beneficiary", Porter was required to deliver to Wentworth a letter addressed to the Annuity Company, stating that the Quarterly Payments were to be sent to Wentworth and was also required to execute an irrevocable  "change in beneficiary" form, indicating that Wentworth was the new payee / beneficiary under the Annuity Contract.  Porter initialed in the bottom left hand corner of at least 12 pages of the 15-page Purchase Agreement, including the pages that contained the provisions previously mentioned, as an indication that he understood and did not object to that page's provisions.

Sometime on or before June 7, 2001, Porter instructed the Annuity Company to send the Quarterly Payments to him and not Wentworth, although he testified in the April 8th hearing that he did not recall doing this.  The Purchase Agreement contained both a choice of law provision and a consent to jurisdiction provision wherein disputes were to be brought only in the Pennsylvania or New Jersey state courts or certain federal district courts in those states.  Wentworth eventually filed suit naming Miller's insurer as garnishee, and on April 2, 2002 obtained an order from the Court of Common Pleas of Philadelphia County that directed Miller's insured to pay Wentworth the

3

Quarterly Payments (the "Garnishment Order"). [1] There was disagreement among counsel in the April 8th hearing as to whether Wentworth previously had obtained a declaratory judgment which determined that Porter had sold his rights to the Quarterly Payments to Wentworth. The Motion refers to a certain "writ of execution" obtained by Wentworth on August 15, 2001 based on a judgment of $87,200, but that judgment was not offered and admitted into evidence and this Court cannot consider it.  Suffice to say that the Court presumes that the April 2, 2002 order would not have directed Miller's insurer to make the Quarterly Payments to Wentworth had there been any bonafide dispute regarding the validity of the sale and the assignment to Wentworth of Porter's rights to the Quarterly Payments.

After the entry of the Garnishment Order, Wentworth received the Quarterly Payments and continued to receive them for over 10 years.  Porter filed his chapter 13 case on August 24, 2012.  Alleging that the "writ of execution" entered on August 15, 2001 created a judgment lien in Porter's property, Porter moved to avoid the judgment lien and filed his Motion on October 25, 2012, over 11 years after the entry of the writ of execution and over ten years after the entry of the Garnishment Order.  Porter took no prepetition action to appeal or set aside the Garnishment order or the writ of execution.

### Discussion

It appears to the Court that what Porter really requests is a determination of his and Wentworth's rights to the Quarterly Payments.  The Motion also asks that this

---

[1] The Annuity Contract between Miller's insurer and the Annuity Company provided that the amount and timing of the Quarterly Payments were to be described in a "certificate".  The April 2nd order incorrectly noted the certificate number and subsequently on July 3, 2002, an amended order was approved reflecting the correct certificate number.

4

Court dissolve the writ of execution and that Wentworth be determined to have violated the automatic stay because it has attached the Quarterly Payments which Porter believes are property of the estate.  Porter in the alternative argues that the Purchase Agreement is invalid because the sale of the Quarterly Payments violated the anti-assignment language contained in the Annuity Contract.

As a threshold matter, a proceeding to determine the validity, priority and extent of liens in property or a proceeding to obtain a declaratory judgment in regards thereto is properly brought as an adversary proceeding under Fed. R. Bankr. P. 7001. Wentworth has not objected to Porter's presenting this matter as a motion to avoid judicial lien and has not filed its own complaint for declaratory judgment.  Thus, any procedural infirmities in this respect are waived.

This matter turns on whether Porter has an interest in the Quarterly Payments. If Porter is to be found to have an interest in the Quarterly Payments, it will be because (1) the Purchase Agreement is invalid because assignment of Porter's interest in the Quarterly Payments was prohibited under the Annuity Contract or (2) if the Purchase Agreement is valid, Porter did not sell his interests in the Quarterly Payments under the Purchase Agreement, but retained ownership of them, subject to Wentworth's security interest.

### *Property of the Estate*

"Property of the estate" is broadly defined under Section 541 to include all the debtor's legal and equitable interests in property held as of the commencement of the case.  11 U.S.C. §541 (a)(1).  Although §541 defines "property of the estate", state law defines the nature and extent of those property interests.  *Butner v. U.S*., 440 U.S. 48,

5

99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

### *Validity and Effect of Anti Assignment Provision*

Neither the Settlement Agreement nor the Purchase Agreement - both signed by Porter – prohibits the assignment of Porter's interest in the Quarterly Payments.  The only language which purportedly prohibits Porter from assigning his interests in the Quarterly Payments appears in the Annuity Contract to which Porter was not a party, but a third party beneficiary.  Under the Annuity Contract, the Annuity Company contracted with and was obligated only to Miller's insurer, in that it was required to make the "purchase payments" to Miller's insurer, who, in turn, was required to remit the payments to Porter.  The Annuity Contract provided, in part, that

> No sum payable under this Contract with respect to any Payee may be assigned, commuted, or encumbered by the Payee, and, to the extent permitted by law, no such sum shall in any way be subject to any legal process against such Payee.

This paragraph prohibits the assignment of "sums payable" *to* the Payee, not "sums received" *by* the Payee.  Porter was neither owner of nor party to the Annuity Contract and therefore there was nothing under *that* contract he could assign to a third party. What Porter could assign was what he owned, and what he owned were the Quarterly Payments provided for under the Settlement Agreement.  The Quarterly Payments were what he assigned under the Purchase Agreement.  The Annuity Contract was merely the vehicle by which the Quarterly Payments were funded.  See, *In re Brooks*, 248 B.R. 99,104 (Bankr. W. D. Mich. 2000) (under Michigan law, anti-assignment clause in annuity contract did not prevent debtor from assigning payments under settlement agreement; debtor had no ownership interest in the annuity and anti assignment clause

6

could only be read as prohibiting assignment of the payments *under the annuity*, but not

the assignment of right to enforce annuity company's continuing obligation to make

payments under the settlement agreement).

Even if the Annuity Contract is interpreted to prohibit Porter's right to assign the

payments he receives under the Settlement Agreement, the general rule in Indiana is

that, if a contract is not for personal services, and does not involve personal trust or

confidence, the rights and duties thereunder are assignable.  *INS Investigations*

*Bureau, Inc. v. Lee,* 709 N.E.2d 736, 741 (Ind. App. 1999) (although recognizing that

torts for personal injuries are not assignable, the court likewise noted that the types of

torts which may not  be assigned have become so narrow that assignability is the

general rule); *McClure & O'Farrell, P.C. v. Grigsby*, 918 N.E.2d 335, 341 (Ind. App.

2009).

As to the Settlement Agreement here, Porter agreed to release all claims against

Miller, and Miller, through her insurer, agreed to pay Porter a sum certain for a

guaranteed twenty years, and, after that, until Porter's death.  The duties owed to each

other were not of a specialized nature like that of a personal services contract.  Each

party essentially performed their respective duties to the point where the Settlement

Agreement was no longer executory - essentially, Miller agreed to pay Porter through

Miller's insurer in exchange for Porter's release of his claims against Miller.  Bankruptcy

courts interpreting such settlement agreements consistently have held that they are not

executory personal service contracts and therefore the benefits afforded by them are

assignable.  See, *In re Terry*, 245 B.R. 422, 426 (Bankr. N. D. Ga. 2000) (where

7

*settlement agreement* contained anti-assignment clause, the court stated that "[n]either contracting party relied on the particular skills or abilities of the other party.  The Debtor simply agreed to release his tort claims..."  and the defendant's insurer "merely contracted to make monthly payments to the Debtor until the year 2015").  *In re Jackson*, 311 B.R. 195, 201 (Bankr. W. D. Mich. 2004) (holding that, under Michigan law, "once a party to a contract performs its obligations to the point that the contract is no longer executory, its right to enforce the other party's liability under the contract may be assigned without the other party's consent, even if the contact contains an anti-assignment clause").  Thus, the Court finds that the Annuity Contract did not prohibit Porter from assigning his interest in the Quarterly Payments.

Even if the Annuity Contract prohibited Porter from legally assigning his interests in the Quarterly Payments, there is sufficient evidence for the Court to conclude that those interests were equitably assigned.  Porter signed and initialed the Purchase Agreement.  Pursuant to Section 4(j) of the Purchase Agreement, Porter represented and warranted that any and all restrictions on the assignment of the Quarterly Payments was made solely for his benefit and for favorable tax treatment and that he agreed to give up such favorable treatment.  Pursuant to Paragraph 4(n) of the Purchase Agreement, Porter represented and warranted that the Purchase Agreement would not violate the Annuity Contract.  Porter accepted the purchase price paid by Wentworth.  He took no steps to challenge or rescind the Purchase Agreement in the nearly fifteen years between execution of the Purchase Agreement and the filing of his chapter 13 case.  He likewise took no action challenging Wentworth's writ of execution against him or the order directing the Annuity Company to remit the Quarterly Payments

8

to Wentworth.  Wentworth paid consideration to Porter and relied on Porter's actions
with respect to the Purchase Agreement and the Quarterly Payments.  Wentworth has
been receiving the Quarterly Payments for over ten years.  These facts are sufficient for
the Court to conclude that Porter should be equitably estopped from denying the validity
of the assignment and that Porter's interests in the Quarterly Payments were equitably
assigned to Wentworth.  See, *Kuhn v Kuhn*, 179 Ind. App. 441, 445, 385 N.E.2d 1196,
1199 (1979); *In re Berghman*, 235 B.R. 683, 691 (Bankr. M. D. Fla. 1999).

### *Sale under the Purchase Agreement*

Having determined that Porter was not prohibited from assigning his interest in
the Quarterly Payments, the next inquiry is whether they were in fact sold and assigned
under the Purchase Agreement.  The Purchase Agreement is replete with clear
references that the transaction between Porter and Wentworth was a sale.  The
section labeled "Background of This Agreement" refers to "a list of payments being sold
under this Agreement" and "you desire to sell and assign to [Wentworth] your rights to
receive all or a portion the Payments".  The first paragraph following the background
paragraph is labeled "Purchase and Sale" and the first sentence in that section provides
"[y]ou now sell, transfer and assign to [Wentworth] all of [y]our rights in the "Assigned
Assets". It refers to the sum to be paid Porter as "the purchase price".  Paragraph (f) of
the section entitled "Your Representations and Warranties" provided that "[y]ou have
valid reasons for selling [y]our interest in the Assigned Assets rather than obtaining a
loan with the Assigned Assets as collateral, and [y]ou agree that the transaction set
forth in this Agreement is not a loan or other financing transaction." Other provisions in
the Purchase Agreement required Porter to instruct the Annuity Company to send the

9

Quarterly Payments to an address designated by Wentworth and, if Wentworth chose, for Porter to give his handwriting sample to Wentworth to allow it to create and use a signature stamp bearing Porter's signature in order to endorse Quarterly Payments checks.  Purchase contracts containing identical language have been held to constitute valid sales and assignments of a debtor's interest in payments under a structured settlement.  *In re Freeman*, 235 B.R. 121, 123 (Bankr. M. D. Fla. 1999).

Finally, Porter argues that the Settlement Agreement should be invalidated because it is inequitable.  Porter testified that he worked two jobs before the accident with Miller, but that he became disabled from the injuries he sustained and that he could not tie his shoes or use the bathroom on his own when he signed the Purchase Agreement.  He alleges that the Purchase Agreement did not contain adequate disclosures regarding the present value of the Quarterly Payments or the discounted rate at which Wentworth was purchasing them.

The Court is well aware that Wentworth paid $5,245.59 for Quarterly Payments that were worth roughly $87,200. [2]  However, it is not this Court's task to determine the fairness of the deal.  Any inequities regarding the adequacy of the disclosures made by Wentworth with respect to the purchase price or any other aspect of the Purchase Agreement should have been raised long ago.  Had Porter sold his interest in the Quarterly Payments to Wentworth a couple of years later, certain disclosures would

---

[2] The Settlement Agreement provided that the Quarterly Payments were to commence on September 7, 2001 and were guaranteed for twenty years.  Thus, Porter's interest in the Quarterly Payments, at a minimum, amounted to $87,200 ($1090 X 4 X 20).

10

have been mandatory and the sale would have required court approval. [3]  But neither Pennsylvania nor New Jersey had enacted structured settlement protection legislation as of the date of the Purchase Agreement, and the Court cannot invalidate the Purchase Agreement because it failed to comply with statutory requirements not yet in place.  The sale set forth in the Purchase Agreement effectively transferred all of Porter's interest in the Quarterly Payments and he had no interests in those payments as of the Petition Date.

The Annuity Contract did not prohibit the assignment of Porter's interests in the Quarterly Payments, and Porter effectively and completely transferred his interest in the Quarterly Payments on August 29, 1997, nearly fifteen years before he filed his chapter 13 case.   Thus, Porter owned no interest in the Quarterly Payments as of the date he filed his chapter 13 case.  The writ of execution obtained by Wentworth was not a per se "judgment" against Porter in the sense that it created a lien in Porter's property.  The writ of execution was the method by which Wentworth enforced the terms of the Purchase Agreement.  Even if the writ of execution can be interpreted as a "judgment" against Porter, it is axiomatic that in order to avoid a judicial lien in property of the debtor under §522(f), a debtor must possess an interest in the property before the lien is fixed.  See, *Farrey v. Sanderfoot*, 500 U.S. 291, 296-97, 111 S. Ct. 1825, 1829-30

---

[3] Pennsylvania's Structured Settlement Protection Act, effective April 11, 2000, requires that the transfer of structured settlement payment rights must be approved by a court of competent jurisdiction and that the court must make express written findings regarding, among other things, the discounted present value of the payments, the gross and net amounts payable to the payee and the percentage of discount (the net amount payable to the payee divided by the present value of payments transferred). 40 P.S. §4003.  New Jersey's structured settlements procedure, implemented August 1, 2001, requires the transferee to provide a separate disclosure statement to the payee setting forth similar information and that the transfer be approved by a court order or order of a responsible administrative authority that expressly finds that the transfer is in the best interest of the payee, taking into account the welfare and the support of the payee's dependents.   N.J.S.A. §2A:16-65; N.J.S.A. §2A:16-66.

(1991); *In re Orr*, 304 B.R. 875, 877 (Bankr. S. D. Ill. 2004); *In re Warfield*, 157 B.R.

651, 653 (Bankr. S. D. Ind. 1993). At best, the property to which the "judgment" lien

attached were the Quarterly Payments, and, at the time the "judgment lien" "attached",

Porter owned no interest in those payments. However, the Court is of the opinion that

the writ of execution was not a per se "judgment" and that it did not attach to any

property in which Porter held an interest. Rather, the Court concludes that Porter owns

no interest in the Quarterly Payments. Accordingly, Porter's motion to avoid the judicial

lien of Wentworth is DENIED.

# # #

Distribution:
Steve Taylor, Attorney for Anthony Porter
Tracy Weber, Attorney for JGWPT Holdings, LLC